UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

<table>
<tr><td>

WELLS FARGO BANK, NATIONAL
ASSOCIATION, AS TRUSTEE FOR THE
BENEFIT OF THE REGISTERED HOLDERS OF
UBS COMMERCIAL MORTGAGE TRUST 2017-
C2, COMMERCIAL MORTGAGE PASS-
THROUGH CERTIFICATES, SERIES 2017-C2,
*acting by and through Midland Loan Services, a
PNC Real Estate Business, as Special Servicer
under the Pooling and Servicing Agreement dated as
of August 1, 2017,*

Plaintiff,

– against –

3708 VESTAL PKWY E., LLC, OLGA J. TSUNIS,
GEORGE TSUNIS, and "JOHN DOE" NO. 1
THROUGH "JOHN DOE" NO. 100, *inclusive, the
last one hundred names being fictitious and
unknown to Plaintiff, the persons or parties intended
being the tenants, occupants, persons or
corporations, if any, having or claiming an interest
in or upon the premises described in the
complaint,*

Defendants.

</td>
<td>

**OPINION & ORDER**

22-cv-4714 (ER)

</td></tr>
</table>

RAMOS, D.J.:

     Wells Fargo Bank, National Association, as Trustee (the "Trustee") for the Benefit

of the Registered Holders of UBS Commercial Mortgage Trust 2017-C2, Commercial

Mortgage Pass-Through Certificates, Series 2017-C2, brings this foreclosure lawsuit

against 3708 Vestal Pkwy E., LLC (the "Borrower") and Olga J. Tsunis and George

Tsunis (the "Guarantors") because of the Borrower's default on loans for which Hampton

Inn & Suites Binghamton – Vestal (the "Property" or the "Hotel"), located at 1708 Vestal

Parkway East, Vestal, New York 13850 is collateral.[1]  The Borrower operates and

---

[1] The complaint also lists unknown parties as defendants who claim an interest in the Property.  Doc. 1.

manages the Hampton Inn hotel under its franchise with Hilton.[2]  Before the Court is the Trustee's motion for the appointment of a receiver.  For the reasons set forth below, the motion is DENIED.

## I.      BACKGROUND

On June 16, 2017, the Borrower entered into a loan agreement (the "Loan Agreement") with Rialto Mortgage Finance, LLC, the original lender, who agreed to lend the Borrower $6,000,000.00 (the "Loan").  Doc. 1 ¶ 13.  On the same day, the Borrower executed and delivered to the original lender a Promissory Note (the "Note") in the principal amount of $6,000,000.00 under the Loan Agreement.  *Id.* ¶ 14.  Also on the same day, the Borrower executed and delivered a mortgage to the original lender (the "Mortgage").  *Id.* ¶ 15.  Pursuant to the Mortgage, the Borrower granted the holder of the Mortgage a security interest in the Property with the land, the improvements, the personal property, the leases and the rents (collectively, the "Collateral").[3]  *Id.* ¶ 15.  To further secure the Loan, on June 16, 2017, the Guarantors agreed to unconditionally guarantee certain obligations of the Borrower under the Loan.[4]  *Id.* ¶ 20.  However, the Borrower has no personal liability for repayment of the Loan, and the Trustee's primary recourse for repayment of the Loan is the Collateral.  *Id.* ¶ 78.

On August 30, 2017, the original lender assigned the Loan, the Loan Agreement, the Note, the Mortgage, and other relevant documents (collectively, the "Loan Documents") to RMF SUB 2 LLC, who assigned the Loan and all Loan Documents to

---

[2] The franchise agreement states, among other things, that any manager of the Hotel must be qualified, experienced, and approved by Hilton in writing.  Doc. 44 at 20.

[3] "Land" is defined as the real property where the Hotel is located, as described in Exhibit A (Description of Land); "improvements" are improvements now or hereafter erected or located on the land; "personal property" is all machinery, equipment, fixtures, and other tangible property; "leases" are all leases, subleases, rental agreements, registration cards and agreements; "rents" are cashes or securities deposited to secure the performance by the lessees of their obligations under the lease.  *See* Exhibit B, Doc. 1 at 25–26.

[4] Section 8.6 of the Loan Agreement provides that if the Borrower violates certain provisions, such as, failing to maintain the Property as a single purpose entity as required, or filing Bankruptcy, etc., then the Guarantors are discharged from the guaranty and the Borrower would be responsible for the full amount of the debt.  Doc. 37-2 at 33.

the Trustee on the same day.  *Id.* ¶¶ 23–24.  The Trustee then became the owner and holder of the original Loan Documents.  *Id.* ¶ 27; *see also* Modification Agreement, Doc. 37-11.

The Borrower fell into default of its obligations under the Loan Documents due to its failure to timely remit the monthly payment of $33,879.35 due on May 6, 2020 (the "Initial Payment Default").  *Id.* ¶ 28.  Consequently, the Borrower, Guarantors, and Trustee entered into a Loan Modification Agreement on June 5, 2020 (the "Modification Agreement").  *Id.* ¶ 29; *see also* Modification Agreement, Doc. 37-11.  Pursuant to the Modification Agreement, all default interest and late fees related to the Initial Payment Default were waived.  *Id.* ¶ 30.  Additionally, the Borrower was required to pay only a portion of the monthly payment for three consecutive months, whereby the remaining portion was deferred.  *Id.*  The partial payments were due on April 6, May 6, and June 6, 2020.  *Id.*  After the three-month reduced payment period, in addition to the regular payment, the Borrower had to pay back one-twelfth of the deferred amount for a year until it paid the accrued deferred amount.  *Id.*  However, the parties stipulated in the Modification Agreement that all payments arising out of the Loan Documents would be immediately due and payable in full without notice or demand if an "Event of Default" occurs.[5]  *Id.* ¶ 31.  Moreover, upon the occurrence of an Event of Default, the Loan Documents expressly allow the Trustee to seek appointment of a receiver.  *Id.* ¶ 79.

The Trustee alleges that, on July 6, 2020, and each payment date thereafter, the Borrower failed to remit the regular monthly payment amount of $33,879.35 plus the deferred monthly payment.  *Id.* ¶¶ 38–39.  Defaults occurred on each payment date from July 2020 to October 2020 and the Borrower failed to cure these defaults despite having been put on notice of the defaults.  *Id.* ¶¶ 40–41.

---

[5] An Event of Default occurs if the Borrower breaches the terms of the Modification Agreement.  *Id.* ¶ 37; *see also* Modification Agreement Section 5(a), Doc. 37-11 at 4.

On February 2, 2022, the Trustee notified the Borrower and Guarantors through their respective counsel that each default constituted an Event of Default, and in turn, the payment acceleration term of the Modification Agreement—which makes all sums under the Loan Documents due immediately—was triggered.  *Id.* ¶ 62.  The total amount due included $5,643,389.52 in principal, and other fees and costs.  *Id.* ¶ 63.  However, the Borrower and Guarantors failed to comply with the payment acceleration term by failing to make any payment.  Doc. 37 ¶¶ 44–45.  The leases, rents, and other assets relating to the ownership and operation of the Property are the sole assets of the Borrower.  Doc. 1 ¶ 77.  Thus, the Trustee alleges that, for security purposes, it is appropriate to take over the assets which are part of the Collateral.  *Id.*  ¶¶ 74–75.

However, the Borrower and Guarantors allege that the Trustee has had exclusive control over a lockbox[6] since its creation and the funds in the lockbox have amounted to more than $200,000.00 per month.  Doc. 42 ¶ 12.  Thus, they allege that the Trustee's interest is well protected by the monies in the lockbox and that a receivership is not necessary.  Doc. 44 at 5.  Moreover, the Borrower arranged for the remaining credit card companies in addition to American Express to transfer all receipts to the lockbox and all credit card receipts have been deposited in the lockbox since September 2022.  Doc. 42 ¶ 20.  Over the course of three years, more than $2 million in Hotel revenue has been placed in the lockbox, which has been under the Trustee's control.  *Id.* ¶ 21.  At present, the Hotel is "thriving,"[7] Doc. 44 at 14–16, and the Trustee controls the funding of the Hotel's operation by its control over the lockbox funds.  Doc. 42 ¶ 22.  The Borrower is also required to submit an operating budget to the Trustee for approval whenever the Hotel needs money to cover its operations.  *Id.*

---

[6] A lockbox was established for credit card payments to the Borrower beginning in December 2019 and it continued to receive funds from American Express at the time of the Modification Agreement.  Doc. 42 ¶¶ 11–12, 18.  The Borrower alleges that the credit card payments to the Borrower are directly deposited in the lockbox which is only accessible to the Trustee.  *Id.*

[7] There has been a 28.86% increase in the total operating revenue, and a 38.34% increase in gross operating profit.  Doc. 44 at 8; Doc. 42 ¶ 25.

The Trustee filed this diversity action on June 6, 2022, and the Borrower and Guarantors filed an answer on January 17, 2023.  Docs. 1, 35.  On the same day they filed their answer, the Trustee moved to appoint a receiver under Federal Rule of Civil Procedure 66.  Doc. 36.

## II.   LEGAL STANDARD

"Whether a federal court should appoint a receiver in a diversity action is governed by federal law."  *U.S. Bank Nat'l Ass'n v. Nesbitt Bellevue Prop. LLC*, 866 F. Supp. 2d 247, 249 (S.D.N.Y. 2012) (quoting *Varsames v. Palazzolo,* 96 F. Supp. 2d 361, 365 (S.D.N.Y. 2000)).  "The appointment of a receiver is considered to be an extraordinary remedy, and should be employed cautiously and granted only when clearly necessary to protect plaintiff's interests in the property."  *Rosen v. Siegel,* 106 F.3d 28, 34 (2d Cir. 1997) (internal alterations and quotation marks omitted).  The following factors are relevant to establishing the need for a receivership:

> Fraudulent conduct on the part of defendant; the imminent danger of the property being lost, concealed, injured, diminished in value, or squandered; the inadequacy of the available legal remedies; the probability that harm to plaintiff by denial of the appointment would be greater than the injury to the parties opposing appointment; and, in more general terms, plaintiff's probable success in the action and the possibility of irreparable injury to his interests in the property.

*Varsames,* 96 F. Supp. 2d at 365 (quoting 12 Wright & Miller, Federal Practice & Procedure § 2983 (1999)) (internal alterations omitted).

For a motion for the appointment of a receiver to be granted, a plaintiff must show that the appointment is necessary to prevent imminent danger to the property.  *Gordon v. Washington*, 295 U.S. 30, 39 (1935) ("[R]eceivership, with the attendant burdensome expenses, should be resorted to only on a plain showing of some threatened loss or injury to the property, which the receivership would avoid.").

III.    **DISCUSSION**

In its motion, the Trustee argued that all four factors favor the appointment of a receiver:  (1) the Borrower agreed in the Loan Documents that the Trustee would be entitled to the appointment of a receiver in the Event of Default, which did occur; (2) the Property will suffer and continue to suffer imminent danger of diminishing in value absent a receiver; (3) the legal remedies available would be inadequate absent a receiver; (4) the Trustee has demonstrated a high likelihood of success on the merits.  Doc. 39 at 4–5.

### A.  The Trustee's Entitlement to the Appointment of a Receiver

The Trustee argues that by signing the Loan Agreement, the Borrower expressly consented to the appointment of a receiver if any Event of Default occurred.  Doc. 49 at 4; *see also* the Loan Agreement, Doc. 37-5 at 12.[8]  However, the Borrower argues that because the Loan Agreement merely provides that the Trustee may "apply" for the appointment of a receiver, the provision does not establish the Trustee's entitlement to the appointment of a receiver and courts retain the discretion to deny the appointment. Doc. 44 at 19.

Courts in this District have held that "the existence of a provision authorizing the application of a receiver in the event of a default, 'strongly supports the appointment of a receiver' when there is a default."  *U.S. Nat'l Ass'n v. Nesbitt Bellevue Prop. LLC*, 866 F. Supp. 2d 247, 250 (S.D.N.Y. 2012) (quoting *D.B. Zwirn Special Opportunities Fund,*

---

[8] Section 8.1(g) of the agreement provides that:

> Upon the occurrence of any Event of Default … Lender may determine, in its sole discretion … apply[ing] for the appointment of a receiver … of the Property, without notice and without regard for the adequacy of the security for the Debt and without regard for the solvency of Borrower, any Guarantor or of any person, firm or other entity liable for the payment of the Debt …

Doc. 37-5 at 12.

*L.P. v. Tama Broadcasting, Inc.,* 550 F. Supp. 2d 481, 497 (S.D.N.Y. 2008)); *see also Wilmington Tr., N.A. v. Winta Asset Mgt. LLC*, No. 20 Civ. 5309 (JGK), 2020 WL 5802365, at *2 (S.D.N.Y. Sept. 28, 2020). "The mere existence of such contractual provision does not, however, dispose of the Court's inquiry in plaintiff's favor." *See D.B. Zwirn Special Opportunities Fund, L.P.* at 491 (noting that courts retain "discretion to deny appointment of a receiver under appropriate circumstances even though the mortgage provides the mortgagee a specific right to an appointment"); *see also Ariani v. 1075 Concourse Tenants Corp.*, 1999 WL 637238, at *2 (S.D.N.Y. Aug. 20, 1999).

Thus, the contractual provision permitting the appointment of a receiver is not dispositive. Accordingly, the Trustee must establish the need for such relief based on the facts of the case. *See Nesbitt Bellevue Prop. LLC*, 866 F. Supp. 2d at 250 (citing *Citibank, N.A. v. Nyland (CF8) Ltd.,* 839 F.2d 93 (2d Cir. 1988)).

**B.  Imminent Danger, Waste, or Fraud as to the Property**

While the Trustee does not allege that the Borrower engaged in any fraudulent conduct, it argues that the Borrower has been pocketing or otherwise diverting a significant sum of the rents because the total revenue of the Property over the past two years—$2,240,920.00 in 2021 and $2,887,749.00 in 2022— is well over the amount in the lockbox, which is approximately $2,000,000.00. Doc. 42 at 8 n.2.; Doc. 49 at 6. The Trustee thus further argues that the fact that the Borrower has failed to correct the defaults indicates that the Borrower is either misappropriating the rents or mismanaging the Property. *Id.* at 9–10.

The Borrower asserts that the Trustee fails to proffer any evidence that suggests that the Property is in imminent danger of diminishing in value. Doc. 44 at 17–19. In

fact, the Borrower argues, that the Hotel is generating increasing revenues due to recent renovations,[9] which actually enhanced its value.  *Id.* at 15.  Furthermore, the Borrower asserts that the appointment of a receiver could materially harm the Hotel because a change in management would jeopardize the Hotel's franchise with Hilton.  *Id.* at 20.

"[The] imminent danger of the diminution of the value of the properties is a critical factor in the analysis of whether to appoint a receiver."  *See Wilmington Tr., Nat'l Ass'n v. Winta Asset Mgmt. LLC*, No. 20 Civ. 5309 (JGK), 2020 WL 5802365, at *1 (S.D.N.Y. Sept. 28, 2020) (quoting *Nesbitt Bellevue Prop. LLC*, 866 F. Supp. 2d at 250); *see also Melnick v. Press*, No. 06 Civ. 6686, 2007 WL 2769490, at *1 (E.D.N.Y. Sept. 21, 2007) ("Plaintiffs are required to make a clear showing that the appointment is necessary to prevent irreparable injury.").  While courts should also consider the injury that the defendants would suffer if a receiver is appointed, "[t]he dispositive issue is whether the appointment of a receiver is '*clearly* necessary to protect plaintiff's interests in the property.'"  *See Nesbitt Bellevue Prop. LLC*, 866 F. Supp. 2d at 254 (quoting *Nyland*, 839 F.2d at 97) (emphasis added).

The Court holds that there is not an imminent danger that the value of the Property is diminishing in this case.  The Trustee cites *Wilmington Tr., Nat'l Ass'n*, where the court agreed that the property faced imminent harm of diminution of value under the defendant borrower's undisputed defaults.  Doc. 49 at 7–8.  The *Wilmington* court provided two grounds for its holding:  (1) the defendant failed to pay the $1.3 million property taxes due on the properties thereby harming their value; and (2) the

---

[9] Since 2019, the owners of the Hotel have been investing $1.4 million of their own money to renovate and upgrade the Hotel.  Doc. 42 ¶¶ 8, 10.

market price of the property fell as a result of the government-mandated lockdowns during the pandemic.  *See Wilmington Tr., Nat'l Ass'n as Tr. for Benefit of Registered Holders of Wells Fargo Com. Mortg. Tr. 2018-C44, Com. Mortg. Pass-Through Certificates, Series 20 v. 31 Prince St., LLC*, No. 22 Civ. 5855 (JGK), 2023 WL 414249, at \*3 (S.D.N.Y. Jan. 25, 2023).

Neither line of reasoning relied upon in *Wilmington* is applicable in the instant case.  The Court agrees with the Borrower that the value of the Property is not diminishing, as the Hotel has recovered from the COVID-19 pandemic and is generating more revenue after the $1.4 million renovation program.  Doc. 44 at 18; Doc. 42 ¶¶ 8, 25–26.  In contrast, while the Trustee alleges the rents in the lockbox are not enough to cover the principal amount the Borrower owed, it fails to allege that the value of the Property is insufficient to provide security for the Loan, as was the case in *Wilmington*. *See Wilmington Tr., Nat'l Ass'n*, 2023 WL 414249 at \*3.

Moreover, the Borrower argues that the appointment of a receiver could instead harm the value of the Property because it could jeopardize the Hotel's franchise with Hilton.  Doc. 44 at 20.  The Borrower's franchise agreement requires that any manager of the Hotel be approved by Hilton in writing.  Doc. 42 ¶ 28.  A new receiver would change the Hotel management and disrupt the Hotel's daily operations.  Doc. 44 at 20.

Accordingly, the Court agrees that the imminent danger of diminution of value is not significant here, and the Trustee fails to explain why the appointment of a receiver is clearly necessary to protect its interests in the Property.

*1.  Adequacy of Legal Remedies*

The Trustee argues that the available legal remedies are not adequate because the $2 million in the lockbox is much less than the amount the Borrower owed after the payment acceleration.  Doc. 49 at 8–9.  Pursuant to the Loan Documents, the Borrower's serial defaults constituted Events of Default that accelerated all sums due, including over $6 million in principal.  Doc. 49 at 8.  However, the Borrower argues that after September 2022, when all credit card receipts were directed to the lockbox, more than $200,000 has been deposited in the lockbox every month, which will provide continuous cash to the Trustee.  Doc. 44 at 13.  The Borrower also points to the current success of the Hotel and its increasing value to support the argument that the operations of the Hotel would cover the amount due, and thus the appointment of receivership is not necessary. *Id.* at 11.

The Court agrees with the Borrower that the legal remedies available in this case are adequate.  The primary legal remedy available to the Trustee in this case is to foreclose on the Collateral.  Doc. 1 ¶ 78.  While the Trustee plausibly alleges that the rents in the lockbox—a part of the Collateral—cannot cover the amount due after the payment acceleration, it does not provide the Court with any evidence as to the value of the Property itself and the other assets constituting the Collateral.  Thus, the Court cannot assess whether foreclosing the Collateral would provide an inadequate remedy.  Moreover, the Guarantors also unconditionally guaranteed certain obligations of the Borrower under the Loan.  *Id.* ¶ 20.  Thus, the Trustee fails to allege that all available legal remedies—including the rents in the lockbox, the leases, the Property itself, and amounts that could be potentially guaranteed by the Guarantors— are inadequate to cover

the amount due under the Loan.  Thus, the Court holds that the Trustee has not met its burden to establish the inadequacy of available legal remedies.

### 2. *The Trustee's Likelihood of Success on the Merits*

The parties do not dispute that the Borrower has defaulted on its obligations under the Loan, that the acceleration of payment has been triggered pursuant to the Loan Documents, and that the Trustee is entitled to the principal amount owed immediately following the Event of Default.  Docs. 1, 42, 44, 49.

The sole dispute regarding the extent of the Borrower's default is the adequacy of the $2 million in the lockbox as security for the loan.  The Borrower argues the $2 million in the lockbox provide "full security" while the Trustee contends that the Borrower failed to turn over all the rents generated on the Property and the lockbox only contains a portion of the rents.  Doc. 44 at 6; Doc. 49 at 7–8.  However, whether the monies in the lockbox fully secure the total amount due under the Loan is not relevant to the proposition that the Borrower in fact defaulted under the Loan Documents.  *See Wilmington Tr., Nat'l Ass'n*, 2023 WL 414249 at *4 ("[A]ny dispute regarding the scope of the Borrowers' default is ultimately immaterial to the disposition of the plaintiff's underlying foreclosure action.").  Accordingly, the Court agrees that the Borrower's repeated failures to make prompt payment as required under the Loan strongly support Trustee's likelihood of success on the merits in this foreclosure case.

In sum, the Court finds that (1) the provision in the Loan Agreement that permits appointment of a receiver does not entitle the Trustee to the appointment; (2) the value of the Property is not in significant imminent danger of diminution; (3) the Trustee has failed to establish the inadequacy of the legal remedies that are available to it; and (4) the

Trustee has shown a high likelihood of success on the merits.  Balancing all factors, the Court holds that the Trustee has not established that the appointment is necessary to prevent imminent danger to the Property or that it is clearly necessary to protect the Trustee's interests in the Property.

## IV.   CONCLUSION

For the foregoing reasons, the Trustee's motion for the appointment of a receiver is DENIED.  The Clerk of Court is respectfully directed to terminate the motion, Doc. 36.

It is SO ORDERED.

Dated:   July 25, 2023
         New York, New York

_____
          EDGARDO RAMOS, U.S.D.J.

12